UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BRENDA THORNTON                              CIVIL ACTION

VERSUS                                       NUMBER: 15-0407

CAROLYN W. COLVIN,                           SECTION: "B"(5)
ACTING COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION

**<u>REPORT AND RECOMMENDATION</u>**

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying Plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based upon disability.  (Rec. docs. 8, 12, 13).

Brenda Thornton, Plaintiff herein, filed the subject applications for DIB and SSI benefits on January 18, 2013, alleging disability as of January 12, 2013.  (Tr. pp. 426-432, 433-439).   In a "Disability Report-Adult" form that appears in the record below, the conditions limiting Plaintiff's ability to work were identified as sarcoidosis; high blood pressure; diabetes; anemia; lesions on the lung, spleen, and liver; fibroid tumors; and a mass on the ovaries.  (Tr. pp. 454-462).  Plaintiff's applications for Social Security benefits were denied at the initial level of the Commissioner's administrative review process on February 27, 2013.  (Tr. pp. 366-369, 370-373).  Pursuant to Plaintiff's request, a hearing *de novo* before an Administrative Law Judge ("ALJ") went forward on October 16, 2013, at which Plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified.  (Tr. pp. 377-378, 379-381, 304-343).  On November 29, 2013, the ALJ issued a

written decision in which she concluded that Plaintiff was not disabled within the meaning

of the Social Security Act. (Tr. pp. 286-303). The Appeals Council ("AC") subsequently

denied Plaintiff's request for review of the ALJ's decision on December 15, 2014, thus making

the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-7). It is from that

unfavorable decision that the Plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g)

and 1383(c)(3).

In her cross-motion for summary judgment, Plaintiff frames the issues for judicial

review as follows:

> I.   THE COMMISSIONER FAILED TO PROPERLY AND ADEQUATELY CONSIDER WHETHER PLAINTIFF'S SARCOIDOSIS, HYPERTENSION, DIABETES MELLITUS, CHRONIC ANEMIA AND OBESITY MEET AND/OR EQUAL THE CRITERIA OF LISTINGS 3.07, 14.06, 14.07 OR 1.04.
>
> II.  THE COMMISSIONER COMMITTED AN ERROR OF LAW BY FAILING TO CONSULT A MEDICAL EXPERT IN DETERMINING WHETHER OR NOT THE CLAIMANT'S IMPAIRMENTS EQUAL A LISTING.
>
> III. THE COMMISSIONER DID NOT APPLY THE CORRECT LEGAL STANDARD WHEN ASSESSING PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY AND THAT FINDING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

(Rec. doc. 8-2, p. 14).

Relevant to the issues to be resolved by the Court are the following findings that were

made by the ALJ:

> 1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.
>
> 2.   The claimant has not engaged in substantial gainful activity since January 12, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3.   The claimant has the following severe impairments: sarcoidosis, essential hypertension, diabetes mellitus, chronic anemia, and obesity (20 CFR

404.1520(c) and 416.920(c)) and *Stone v. Heckler*, 752 F.2d 1099 (5ᵗʰ Cir. 1985).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with the following additional limitations. The claimant could never climb ladders, ropes, and scaffolds. She could only occasionally balance, stoop, crouch, kneel, crawl, and climb ramps and stairs. The claimant should avoid all work with moving and dangerous machinery, as well as all commercial driving and all work at unprotected heights. She must avoid even moderate exposure to pulmonary irritants such as fumes, odors, dust, poorly ventilated areas and chemicals. Occasionally, the claimant must avoid all exposure to extreme heat and extreme cold.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on October 16, 1966 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 12, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. pp. 291, 293, 294, 297, 298, 299).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries:   (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards.  *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1970).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).   Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983).  The Court may not reweigh the evidence or try the issues *de* novo, nor may it substitute its judgment for that of the Commissioner.  *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act.  *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A).  Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of

performing substantial gainful activity and is, therefore, not disabled. *Harrell*, 862 F.2d at 475. In making this determination, the Commissioner uses the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings;

2.    An individual who does not have a "severe impairment" will not be found to be disabled;

3.    An individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors;

4.    If an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made;

5.    If an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed;

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. *Fraga*, 810 F.2d at 1304 (citing *Lawler v. Heckler*, 761 F.2d 195, 198 (5th Cir. 1985)). Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Fraga*, 810 F.2d at 1302.

The medical evidence that was generated during the relevant time period[1/] begins with records from the Interim LSU Public Hospital ("ILPH") where Plaintiff presented to the Emergency Room ("ER") on January 12, 2013 with complaints of generalized body aches and pain and intermittent shortness of breath for the previous two weeks after exhausting her supply of sarcoidosis medication which was on back order.  Plaintiff was in no respiratory distress and had clear breath sounds at the time of triage but was observed to be in tears secondary to pain.  She also reported non-radiating chest pain for one week which had worsened over the previous day as well as flu-like symptoms with a low-grade fever.  The chest pain was characterized as severe, was reproducible, and was worse with movement, including breathing and coughing.  Upon physical examination, rales were noted but Plaintiff was in no respiratory distress.   Tachycardia was present.   From a musculoskeletal standpoint, there was a normal range of motion but tenderness was present at an unspecified location(s).  The admission diagnosis was sarcoidosis, unspecified essential hypertension, uterine fibroid, chest pain, anemia, and diabetes mellitus.  During her hospital stay, Plaintiff was treated with IV hydration, antibiotics, and Methotrexate.  A CT scan of the chest revealed multiple pulmonary nodules as shown on previous imaging.  Plaintiff was discharged in good condition on January 13, 2013 with a diagnosis of costochondritis, sarcoidosis, hypertension, viral bronchitis, uterine fibroids, pre-diabetes, HLD, and obesity.  She was prescribed Zithromax, Flexeril, Neurontin, Advil/Motrin, and Prinivil/Zestril, was to follow-up with the

---

[1/] Under 20 C.F.R. §§404.1512(d) and 416.912(d), the Commissioner is charged with developing the medical history of a DIB/SSI claimant "… for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application." (Emphasis added).  As Plaintiff filed her applications for Social Security benefits on January 18, 2013 and alleged disability as of January 12, 2013, which is less than 12 months earlier, the relevant time period begins with the latter date.

LSU Pulmonary Clinic and her primary care physician, and was to keep her then-scheduled appointment with the LSU Gynecology Clinic.  Elsewhere in this set of medical records it was noted that Plaintiff had been struck by a motor vehicle on December 3, 2012 with no resulting fractures but with inflammation to the hip and neck.  (Tr. pp. 624-659).

On January 16, 2013, Plaintiff was seen by Nurse Practitioner ("NP") Krystal Howard of the Daughters of Charity for follow-up care.  She reported feeling well after being restarted on Methotrexate during her brief hospital admission but was in need of medication for the next week.  The assessment was benign essential hypertension and Type 2 diabetes mellitus.  Methotrexate was dispensed and the dosage of Lisinopril was adjusted.  (Tr. pp. 530-531).  On that same date, Plaintiff was also seen at the LSU Gynecology Clinic for an annual examination.  She had no complaints at the time.  The attending physician noted a history of menometrorrhagia secondary to uterine fibroids, manifested by heavy periods lasting at most 14 days and requiring heavy duty hygiene items.  A hysterectomy had previously been scheduled but after Plaintiff was diagnosed with sarcoidosis with multi-organ involvement, the surgery had been deferred.  At the time of this evaluation it appeared that Plaintiff's sarcoidosis was under better control with Methotrexate but she was still struggling with symptomatic bleeding, enlarging fibroids, and symptomatic anemia.  The assessment was a routine gynecological exam, uterine fibroid, abnormal uterine bleeding, anemia, and sarcoidosis.  Plaintiff was to continue her prescribed medications and was to be seen at the Pulmonology Clinic for surgical clearance with the hope that the desired hysterectomy could be scheduled.  (Tr. pp. 660-664).

On February 10, 2013, Plaintiff completed the Administration's "Function Report-Adult" form that is designed to elicit information about how her conditions limited her

7

activities.  There, Plaintiff indicated that as a result of her various illnesses she was unable to work due to decreased activity tolerance, being short of breath daily and having diminished energy.  Because her sarcoidosis was active at the time, she was in and out of the hospital on a monthly basis or had doctors' appointments every week, making it impossible for her to maintain employment.  An average day for Plaintiff consisted of rising, taking her medications, eating, and lying around the house as she was no longer able to do any chores.  Odors from cleaning supplies or even cooking exacerbated her condition as did physical activity.  Dressing and bathing could be done with some difficulty but Plaintiff was able to feed herself and tend to hygienic needs.  She was able to prepare simple meals like sandwiches on occasion but was limited due to fatigue and shortness of breath.  Plaintiff reportedly did no household chores.  She could drive or ride in a car and shop on a weekly basis for groceries and medications.  Financial matters could be tended to without difficulty.  Hobbies and interests included reading, watching TV, traveling, and going out but Plaintiff was unable to travel or to be active as she once had.  She socialized with those relatives or friends who visited her to cook and perform household chores and she attended church on a weekly basis.  Her conditions reportedly limited her ability to engage in a wide range of activities including simply using her hands.  Plaintiff indicated that she could walk for only 10 feet before having to rest, sometimes for upwards of 30 minutes.  She could follow instructions, get along with others, and handle stress well but had difficulty with changes in routine and was fearful because of her condition.  (Tr. pp. 476-485).

Plaintiff was next seen at the LSU Pulmonology Clinic on February 27, 2013 for management of her sarcoidosis with multi-organ involvement of the skin and lungs.  Pre-evaluation studies had not been done except for pulmonary function tests which showed a

diminishment of her overall lung function consistent with worsening lung nodules that were revealed on a CT scan that was performed during her hospital admission.  Plaintiff reported that her symptoms had worsened with more dry cough, more shortness of breath, and numbness involving the lower extremities.  Upon physical examination, Plaintiff had normal effort and breath sounds and was in no respiratory distress with no rales or wheezes.  There was a normal range of motion of the extremities with no edema.  The assessment was refractory systemic sarcoidosis involving the lungs, skin, and joints and now with peripheral neuropathy as well; hypertension; Type 2 diabetes; chronic immunosuppression; and, morbid obesity.  Plaintiff was to continue on her current treatment regimen and, pending further consultation and testing, was to return in six months.  (Tr. pp. 689-702).

On March 13, 2013, Plaintiff was seen again at the LSU Gynecology Clinic for follow-up care, stating that she was still experiencing frequent, heavy menstruation and pelvic pain.  She also reported shortness of breath and unspecified numbness but no chest pain.  The assessment was fibroid uterus and an adnexal mass.  A repeat ultrasound was to be sought on an expedited basis.  (Tr. pp. 703-713).  The following day, Plaintiff was seen again at the Rheumatology Clinic for possible therapy escalation and management after worsening lung function despite Methotrexate treatment.  Plaintiff complained of worsening shortness of breath with minimal exertion and persistent dry coughing spells which resulted in vomiting.  Other complaints included bilateral lower extremity achy pain with some weakness, worse with ambulation, as well as right leg numbness, with the leg pain pre-dating her December 2012 motor vehicle accident.  Upon physical examination, Plaintiff had normal effort and breath sounds and was in no respiratory distress with no wheezes.  There was a normal range of motion of the extremities and unspecified tenderness with no edema.  Strength was

4/5 in the hamstrings and quadriceps bilaterally but 5/5 elsewhere with a full range of motion throughout and no synovitis, joint swelling, or deformity.  Plaintiff's skin was dry with a mild rash to the upper back, face, and neck.  In light of the current findings and based on the results of the chest CT scan of January 13, 2013 and February 27, 2013 pulmonary function tests, the assessment was sarcoidosis with multi-organ involvement.  Plaintiff's medication regimen was adjusted and further testing was to be sought including a bronchoscopy and possibly a biopsy.  Remicade treatments were also considered.  (Tr. pp. 714-731).

Plaintiff underwent a pelvic ultrasound on April 2, 2013 which revealed an enlarged leiomyomatous uterus containing multiple fibroids.  Hydroxychloroquine was prescribed. (Tr. pp. 735-754).  A CT scan of the thorax was performed on April 3, 2013 which revealed innumerable nodular opacities and small pulmonary masses consistent with Plaintiff's history of systemic sarcoid with infection thought to be less likely given the lack of changes over the previous three months.  A nodular density was also seen adjacent to the left adrenal gland which was unchanged.  (Tr. pp. 755-775).  Plaintiff was seen again at the Gynecology Clinic on April 4, 2013 to discuss the recent test which showed resolution of the previously noted adnexal mass.  The assessment was uterine fibroid, sarcoidosis, and abnormal uterine bleeding.  Plaintiff was started on Provera with the hope that surgical management of her fibroids could go forward after better control of her pulmonary sarcoid was achieved. Plaintiff was to return in one month.  (Tr. pp. 776-786).  Additional testing was performed on April 25, 2013 including a cardiac MRI which revealed left ventricular ejection fraction of 60% and 41% on the right with no wall motion abnormalities and no pericardial effusion. (Tr. pp. 787-815).

Plaintiff was seen again at the ILPH on April 30, 2013 for complaints of blurred vision. There was lattice degeneration to the eyes but visual acuity was 20/25 on the right and 20/30 on the left and there was no active sarcoid-related inflammation or involvement. Plaintiff was to return in one year.  (Tr. pp. 820-829).  She was next seen at the ILPH ER on May 2, 2013 for a cough and shortness of breath.  (Tr. pp. 830-839).  Plaintiff returned to the ER the following day complaining of shortness of breath for two weeks, chest pain, a dry cough, and an inability to retain solid food.  She advised attending personnel that her shortness of breath occurred frequently and was relieved by nothing but the problem was characterized as mild.  Elsewhere in the medical records the pertinent negatives included no chest pain or pressure and no fever or sore throat.  Plaintiff's cough was described as a recurrent, constant problem that was non-productive but was associated with shortness of breath and wheezing.  Upon physical examination, Plaintiff was observed to be in no respiratory distress but had diffuse wheezes and coarse breath sounds bilaterally with no rales or tenderness.  Plaintiff was treated with IV Duoneb/Tessalon and four nebulization treatments and was discharged the following day with a diagnosis of sarcoidosis, unspecified essential hypertension, an acute upper respiratory infection, and Type 2 uncomplicated diabetes.  (Tr. pp. 830-865).

Plaintiff presented to the ILPH on May 7, 2013 with a continued, worsening cough and shortness of breath.  The prescribed Albuterol, Prednisone, and cough suppressants had not produced any relief and Plaintiff was said to be in mild respiratory distress.  She was splinting on the left side and had poor inspiratory effort that was interrupted by a loud hacking cough.  Upon physical examination, Plaintiff had normal breath sounds with no wheezes or rales but with tenderness.  The cardiovascular exam was normal but Plaintiff was

noted to have pain to the left rib area at a level of "8." X-rays revealed decreased lung volume bilaterally and persistent bilateral pulmonary nodules. Plaintiff was administered three nebulization treatments as well as Zithromax, Deltasone, Robaxin, and Robitussin. The final diagnosis was a cough, sarcoidosis, shortness of breath, unspecified essential hypertension, and Type 2 diabetes without complication, not stated as uncontrolled. Prescribed medications included Albuterol, Norvasc, Zithromax, Tessalon, Neurontin, Plaquenil, Lisinopril, Provera, Methotrexate, Deltasone, and Phenergan with codeine. (Tr. pp. 866-899).

On May 8, 2013, Plaintiff was seen by Dr. Kyle Happel of ILPH for follow-up care. Plaintiff's cough persisted despite her prescribed treatment, which had resulted in left-sided chest wall pain. TNF modulator therapy was to be considered if malignancy and infection could be ruled out. On physical examination, Plaintiff was in no respiratory distress with normal effort and breath sounds and no wheezes. The assessment was refractory systemic sarcoidosis involving the lungs, skin, and joints; hypertension; diabetes; chronic immunosuppression; and morbid obesity. Plaintiff was to continue on her treatment regimen pending further consultation and testing in an attempt to rule out infection and malignancy and was to return in four to five months. (Tr. pp. 900-912).

Plaintiff returned to the Rheumatology Clinic on May 16, 2013 with complaints of worsening shortness of breath with minimal exertion, persistent dry coughing spells that led to vomiting, and incontinence with resulting chest and abdominal pain. The coughing was characterized as "terrible" and "disabling." Strength was 4/5 in the hamstrings and quadriceps but 5/5 elsewhere with a full range of motion throughout. The assessment was sarcoidosis with multi-organ involvement; coughing causing terrible costochondritis pain,

vomiting, and incontinence; and an adrenal nodule.  Plaintiff was to be started on a multi-week course of Remicade treatments.  (Tr. pp. 919-932).  She received the first of such infusions on May 20, 2013, explaining that her persistent dry cough was the "worst part of it," sometimes leading to vomiting, as well as a sore throat and bilateral lower rib pain for the previous month.  Plaintiff tolerated the procedure well.  (Tr. pp. 933-944).  Further testing went forward on May 28, 2013.  (Tr. pp. 945-958).  An additional visit to NP Howard occurred on May 30, 2013 and medication refills were authorized.  (Tr. pp. 1022-1024).

On June 3, 2013, Plaintiff received a second Remicade treatment.  (Tr. pp. 959-972).  A third treatment was administered on July 1, 2013.  (Tr. pp. 973-985).  When Plaintiff was next seen at the Rheumatology Clinic on August 1, 2013, "significant improvement" to her symptoms was noted.  Gabapentin was to be added to Plaintiff's medication regimen to help with her numbness, tingling, and arthralgia.  Although a decrease in her cough and shortness of breath was reported, she was still unable to walk two city blocks and had a dry cough with some associated chest pain.  Plaintiff also reported intermittent parethesias of all four extremities, diffuse myalgias, and arthralgias but no rashes, eye irritation, changes in vision, or joint swelling.  Her medications were adjusted.  (Tr. pp. 986-1007).  A further Remicade treatment was administered on August 26, 2013 and Plaintiff's sedimentation rate was high at 53.  (Tr. pp. 1008-1016).  The following day, Plaintiff was seen again by NP Howard for follow-up and medication refills.  Plaintiff's lungs were normal and were clear to auscultation.  The assessment was benign essential hypertension, familial hypercholesterolemia, Type 2 diabetes, and anemia.  Her medications were adjusted.  (Tr. pp. 1018-1021).

Plaintiff was next seen at the Pulmonology Clinic on September 4, 2013.  She still had an occasional cough and pleuritic chest pain but there had been no worsening of her shortness of breath or any weight loss.  Despite increased Neurontin, Plaintiff continued to experience pain to a lower extremity.  On physical examination, Plaintiff had normal effort and breath sounds but she did exhibit tenderness to the shins, the right greater than the left. The assessment was sarcoid and neuropathy for which Plaintiff was referred to the Neurology Clinic.  In a related treatment record, Dr. Happel noted that Plaintiff had minimal CT findings of pulmonary sarcoidosis and that her hepatic involvement was not symptomatic.  The doctor also questioned whether the anti-TNF therapy was of much help in addressing Plaintiff's pulmonary sarcoid and suspected that the majority of her restrictions were due to her body habitus.  (Tr. pp. 1065-1068).

Plaintiff was next seen at the Rheumatology Clinic on September 19, 2013, reporting that she was "somewhat better," her cough having improved but being the worse at night. Night-time reflux and rumination were also noted as was asthma that was controlled with Albuterol.  Plaintiff additionally complained of a six-month history of right radicular pain, worse with movement and bending, and "knots" on the base of her feet that developed into blisters and caused difficulty walking due to pain.  Upon physical examination, Plaintiff's chest was clear to auscultation bilaterally with no wheezes or rales and the extremities had no cyanosis, clubbing, or edema with a full range of motion and intact gait.  The assessment was sarcoidosis with nodular pulmonary disease and hepatic involvement, a cough, GERD, low back pain with radiculopathy, and foot pain.  TNF inhibitor therapy was to be continued and Plaintiff was referred to physical therapy and podiatry.  (Tr. pp. 1069-1082).

14

On September 27, 2013, Plaintiff returned to NP Howard complaining of cold symptoms and tingling in the arms and legs. The assessment was acute bronchitis, sarcoidosis, lumbago which had resolved, and neuropathy. Medications were prescribed. (Tr. pp. 1052-1054). Plaintiff presented to the ILPH ER on October 9, 2013 complaining of a cough, cold, and congestion with body aches of two weeks' duration. X-rays were taken. The impression was an overall improved appearance of bilateral pulmonary nodules when compared to a prior study of May 7, 2013. The final diagnosis was acute bronchitis and unspecified asthma. Additional medications were prescribed. (Tr. pp. 1083-1088). Plaintiff received another Remicade treatment on October 14, 2013. (Tr. pp. 1089-1090). She was seen again by NP Howard the following day, reporting "feeling better" since her most recent ER visit. The results of an examination were unremarkable. The assessment was acute bronchitis which had resolved, sarcoidosis, headache syndrome, episodic mood disorder, and iron deficiency anemia secondary to chronic blood loss. (Tr. pp. 1050-1051). On this same date, NP Howard completed a "To Whom It May Concern" form in which she reported that Plaintiff was unable to work at the time due to the combination of her various impairments and attendant symptomology. (Tr. p. 1048).

As noted earlier, a hearing *de novo* before an ALJ went forward on October 16, 2013. At the start of the hearing, Plaintiff's attorney made an opening statement in which she provided a history of Plaintiff's medical problems, which had begun several years during pre-operative clearance prior to a recommended hysterectomy. During the course of that pre-op work-up, Plaintiff was diagnosed with sarcoidosis which worsened in early 2012 and which primarily affected the lungs as well as the joints, skin, liver, and spleen. Despite treatments with steroids and Methotrexate, Plaintiff's condition continued to worsen and by

early 2013, she was forced to discontinue work.  Counsel elaborated on Plaintiff's treatment and symptomology, culminating in a series of Remicade infusions.  She further intimated that Plaintiff's condition satisfied the criteria of Section 14.06 of the Listing of Impairments.  In addition to sarcoidosis, Plaintiff also suffered from costochondritis, hypertension, chronic blood loss, anemia, and Type 2 diabetes with attendant vision issues.  (Tr. pp. 306-310).  After the documentary exhibits were formally admitted into evidence, Plaintiff took the stand and was questioned by the ALJ.  She first testified that she had actually stopped working in December of 2012, holding a job in housekeeping at the time until she began having problems with walking and with handling chemicals.  Plaintiff testified that she could walk no more than 200 feet without experiencing back and leg pain, a side effect from her medications.  She also related breathing problems.  Although she once weighed as little as 175 pounds, her weight had risen to 240 as a result of taking steroids.

On a personal level, Plaintiff lived with her daughter and her daughter's three children, with Plaintiff assisting with the care of her four-year-old grandchild for a portion of the day, including driving to pick the child up from daycare three days per week.  Plaintiff testified that she did no shopping, cooking, or household chores, that all such tasks were performed by her daughter.  A typical day consisted of rising in the morning, taking medications, watching TV, and generally lying around the house.  (Tr. pp. 310-314).

Upon further questioning by her attorney, Plaintiff testified that before her condition worsened in January of 2013, she was working as a housekeeper and living on her own.  Since she stopped working, Plaintiff had experienced severe exacerbations that required hospitalizations.  On one such occasion, Plaintiff reportedly suffered severe chest pains while driving and had to call 9-1-1 for emergency assistance.  Coughing continued to be constant

and was often so severe that it led to vomiting and incontinence but such episodes had admittedly decreased to three to four times per month.  Plaintiff's coughing also resulted in pain to her back and torso and shortness of breath.  In Plaintiff's opinion, her lung functioning had worsened over the previous year, with shortness of breath and pain and numbness to the right leg such that it would sometimes give out.   Pain left Plaintiff fatigued and aggravated.  She also complained of pain and tingling in the hands.  (Tr. pp. 314-318).

Plaintiff testified further to being followed by the Rheumatology Clinic for lesions to her lungs and she was now beginning to develop nodules in her legs and a rash to her face and to her upper body.  However, the rash was not particularly painful.  After picking up her grandson from school at 3:00, Plaintiff would often return home and recline due to her pain, sometimes receiving a leg massage from the child.  On "bad" days, which Plaintiff estimated to be 10 to 15 per month, she spent almost the whole day in bed.  Recently, she had begun suffering from headaches on a daily basis.   Turning to prescribed medications, Plaintiff testified to using a nebulizer three times per day and she took ferrous gluconate for her anemia.   Other medications addressed blood loss.   Since starting on Remicade, Plaintiff testified that she had not noticed any improvement to her condition nor had her doctors reported any such improvement.  Despite pain medication, Plaintiff was now experiencing pain in the legs and hands due to rheumatoid arthritis with numbness and tingling in the hands and cramps in her toes.  She did not sleep at night secondary to pain and spent some portion of every day in bed due to pain and depression.

Through further questioning of Plaintiff by the ALJ, it was revealed that Plaintiff was no longer taking diabetes medication as the condition was under control following a weight loss.  Plaintiff's last hospital admission had been a one-day stay approximately four months

earlier and only one admission had been more than one night.  Plaintiff needed no assistance with self-care.   Although she complained of sleeping difficulties over the previous five months, Plaintiff admitted to getting a total of eight hours of sleep in a typical 24-hour period.  She was becoming more anti-social and depressed but had not been prescribed medication for it by NP Howard.  Cough medicine had been prescribed at Plaintiff's most recent ER visit.  (Tr. pp. 325-328).   At this point in the hearing, counsel recalled the course of Plaintiff's sarcoidosis treatment, the interrelation of her various conditions, and the combination of medications that had been used to treat them.  Before transitioning to nebulizer treatments two months earlier, Plaintiff had used a pump to administer Albuterol four times per day.  More recently, Plaintiff's condition had not improved sufficiently enough to allow her to undergo a bronchoscopy or hysterectomy as she could not tolerate anesthesia.  (Tr. pp. 328-333).

Heyward Johnson, a VE, was the next witness to take the stand.  He began by first classifying the exertional and skill demands of Plaintiff's past work, as follows:  fast food worker – light with an SVP of 2; fast food assistant manager – light with an SVP of 6; fast food manager – light with an SVP of 5; home healthcare worker in a group home setting – light with an SVP of 3; home healthcare supervisor – sedentary with an SVP of 6; hospital housekeeper – medium with an SVP of 2; restaurant server – light with an SVP of 3; and, security guard – light with an SVP of 3.  The ALJ then posed a hypothetical question to the VE which assumed an individual of Plaintiff's age, education, and work experience who would be "off track" 20% of the workday in addition to customarily allowed breaks.  In answer to that first hypo, the VE testified that there would be no work that the described individual could perform.  For a second hypothetical question, the individual could perform light work

but could never climb ladders, ropes, and scaffolds; could only occasionally climb ramps and stairs and balance, stoop, crouch, kneel, and crawl; would need to avoid all work with moving, hazardous, and dangerous machinery, all commercial driving, and all work at unprotected heights; should avoid even moderate exposure to pulmonary irritants; and, should avoid all exposure to extreme heat and cold. With that profile in mind, the VE testified that the individual described in the ALJ's second hypothetical question could perform the two home healthcare positions that he had identified. Following discussions about the skill level of the first home healthcare position the VE had identified, the ALJ queried Plaintiff about the extent of any vision problems. In response, Plaintiff testified to experiencing blurred vision due to her sarcoidosis which was more problematic in seeing at a distance. (Tr. pp. 333-339).

The VE was then questioned further by the ALJ. In addition to the healthcare positions he had previously identified, the VE testified that the person described in the ALJ's second hypo could perform a reduced number of security guard positions. In addition, the hypothetical person could perform the light, unskilled jobs of merchandise marker, cashier, and information clerk, with significant numbers of such jobs existing in the national economy. (Tr. pp. 339-341).

Upon being tendered to Plaintiff's attorney for additional questioning, the VE was referred to the ALJ's second hypothetical question with added limitations of being unable to walk more than two blocks at a time for more than two hours a day and work that required all avoidance with the public, only occasional contact with supervisors and coworkers, and work away from all pulmonary irritants. Presented with that modified hypothetical question, the VE testified that the described individual could not perform any of Plaintiff's

past work.  The limitation on standing would also exclude the described individual from performing the merchandise marker, cashier, and information clerk jobs the VE had identified.  Notably, if an individual missed more than three workdays per month, employment could not be maintained.  Yet another hypo was propounded to the VE which tracked the ALJ's second hypothetical question with the added limitation that the individual would be non-functional for half of the workday due to chronic fatigue and malaise, chronic pain, and frequent coughing.  Faced with that profile, the VE testified that no work could be performed.  The hearing then closed.  (Tr. pp. 341-343).  Following the hearing, Plaintiff returned to NP Howard on November 11, 2013 for follow-up care of her headache syndrome. Fioricet was prescribed.   (Tr. pp. 266-268).   The assessment was benign essential hypertension at a subsequent visit to NP Howard on November 22, 2013 and Plaintiff's medications were adjusted.  (Tr. pp. 264-266).

Following bloodwork that was done on December 9, 2013, Plaintiff was seen again at the ILPH Rheumatology Clinic on December 19, 2013 for multiple complaints of intermittent paresthesias to the extremities, weight gain, a mobile mass in the right side of her neck overlying the clavicle which she had not noticed before, and worsening depressive symptoms.   Despite recent pulmonary function test results that were stable and demonstrated a decrease in nodularity, she also complained of continued shortness of breath.  Upon physical examination, Plaintiff's chest was clear to auscultation bilaterally with no wheezes or rales and there was no chest wall tenderness.  A musculoskeletal exam revealed no synovitis, a full range of motion, an intact gait, and negative straight leg raising although there were positive tender points.  A chest x-ray demonstrated an overall improved appearance of bilateral pulmonary nodules when compared to studies of May 7, 2013.  The

assessment was sarcoidosis; a neck mass, most likely a lipoma; paresthesias, most likely obesity-related; depression; and obesity.  Plaintiff's existing medications were adjusted and she was also prescribed Celexa.  (Tr. pp. 160-172).  Progressive dyspnea and coughing were still present when Plaintiff was seen by NP Howard on January 9, 2014.   Plaintiff's medications were adjusted further.  (Tr. pp. 263-264).

On January 13, 2014, Plaintiff was seen again at the Neurology Clinic for symptoms of focal sensory loss.  Plaintiff's lungs were clear to auscultation with no rales or rhonchi; there was no joint tenderness, deformity, or swelling; her skin had normal coloration and turgor with no rashes or suspicious skin lesions noted; she had a normal range of back motion; and 2+ pulses were present in all extremities peripherally.  Plaintiff had a normal mood and effect and normal behavior.  A neurological exam was largely unremarkable.  The assessment was bilateral leg numbness, muscle cramps, and sarcoidosis.  Further testing was scheduled and Plaintiff was prescribed Elavil.  (Tr. pp. 173-180).  She subsequently presented to the ILPH ER on January 18, 2014 with complaints of chest pain but chest x-rays were normal as were ECG results.  On this occasion, Plaintiff left without being seeing after being triaged.  (Tr. pp. 181-188).

On January 22, 2014, Plaintiff underwent an MRI of the thoracic spine that revealed only mild degenerative changes.  A similar study of the lumbar spine showed mild congenital narrowing of the lower lumbosacral canal but no other significant findings or degenerative changes.  (Tr. pp. 189-192).  At a return visit to NP Howard on January 24, 2014, Plaintiff complained of pain to the buttock area with abscess.  The assessment was cellulitis of the buttocks and medications were prescribed.  (Tr. pp. 260-261).  A CT scan of the neck was performed on January 27, 2014 through which no pathological mass lesion was identified.

(Tr. pp. 193-194).  Another Remicade infusion was administered on February 10, 2014.  (Tr. pp. 195-198).  Plaintiff returned to the Rheumatology Clinic on February 20, 2014 with her biggest complaint being a rash of recent onset that was affecting her scalp, ear canal, and a portion of her back.  The assessment was a rash, possibly Norwegian scabies, and sarcoidosis and Plaintiff was prescribed Permethrin Cream, Ivermectin, and Hydroxyzine.  Methotrexate was temporarily discontinued pending improvement to her rash.  (Tr. pp. 199-208).  Plaintiff complained of stabbing pain in the chest that was radiating to the back when she was next seen by NP Howard on February 24, 2014.   The assessment was benign essential hypertension, atopic dermatitis, and costochondritis.  Plaintiff was prescribed Prednisone and was to consult with a specialist.  (Tr. pp. 259-260).

Plaintiff underwent an ultrasound of the right shoulder on February 25, 2014 which revealed a lipoma in the region of the previously palpated abnormality.  (Tr. pp. 209-210).  On March 5, 2014, Plaintiff was seen yet again at the Pulmonary Clinic.  Increased chest pain was present since Methotrexate had been discontinued as well as lower extremity discomfort.  On physical examination, Plaintiff was in no respiratory distress with normal effort and breath sounds and no wheezes, rales, or tenderness.  A deep ache in the legs was present with palpation.  The assessment was sarcoid and restrictive lung disease.  Further testing was scheduled.  (Tr. pp. 211-214).  Plaintiff was seen again at the Neurology Clinic on March 10, 2014, complaining of low back pain for the previous six months and pain from the knees to the feet bilaterally.  Plaintiff exhibited an antalgic gait but station was stable with strength 5/5 throughout.  The attending physician, Dr. DiGiorgio, opined that the previous MRI results did not explain Plaintiff's peripheral symptoms as there was no neuronal compression.  She was thus advised to lose weight and to exercise for treatment of her back

pain.  (Tr. pp. 215-217).  Further follow-up care for Plaintiff's rash was administered by NP Howard on March 17, 2014.  (Tr. pp. 257-259).

On March 27, 2014, Plaintiff was seen again at the Rheumatology Clinic for worsening of her skin rash.  She also complained of shortness of breath and a cough.  A punch biopsy was done to better evaluate Plaintiff's condition.  The assessment was new lesions on the lower extremities that appeared to be secondary to sarcoidosis and elevated transaminases that were thought to be evidence of increased sarcoidosis activity.  The punch biopsy revealed subacute spongiotic dermatitis thought to be compatible with allergic contact dermatitis.  Plaintiff was prescribed Prednisone as well as Cellcept.  (Tr. pp. 218-244).  Plaintiff was then seen by NP Howard on April 29, 2014 for evaluation of her long-standing history of headaches and chest pain.  Plaintiff's lungs were normal and clear to auscultation and there was no costovertebral angle tenderness to the back.  The assessment was benign essential hypertension, Type 2 diabetes, costochondritis, sarcoidosis, and headache syndrome.  An ECG was to be scheduled and Plaintiff's medications were reconciled.  (Tr. pp. 256-257).

Plaintiff returned to the Neurology Clinic on May 5, 2014 with complaints of numbness to the arms bilaterally and associated symptoms of chest pain, headaches, and myalgias.  Her lungs were clear to auscultation bilaterally with no rales or rhonchi and there was no joint tenderness, deformity, or swelling.  Motor strength was 5/5 throughout with normal muscle bulk and tone.  The assessment was numbness and tingling in the hands and legs, sarcoidosis, and contact dermatitis.  MRIs of the cervical and thoracic spines were to be scheduled.  (Tr. pp. 246-254).  Plaintiff was next seen by Dr. Saketkoo of the ILPH on May 29, 2014, complaining of a headache of two weeks' duration on the left-sided temporal/parietal

area that was affecting the vision in her left eye.  The assessment was pulmonary and hepatic sarcoidosis; a history of cutaneous sarcoidosis by clinical diagnosis; likely neurologic sarcoid with small fibre neuropathy, numbness, and tingling; new onset of left-sided headaches with blurred vision; a clavicular bone lesion; allergic dermatitis; and transamitis, possibly related to sarcoidosis.  As an immediate Ophthalmology Clinic appointment could not be obtained, Plaintiff was instructed to proceed to the ER for further evaluation.  Her medications were adjusted and further testing was to be scheduled including pulmonary function tests, an MRI of the brain, and an ultrasound of the liver.  (Tr. pp. 14-22).

On June 3, 2014, Plaintiff was seen again at the ILPH Eye Clinic.  The results of the evaluation were sarcoidosis with no ocular involvement, lattice degeneration with no holes or tears, a stable chorodial nevus in the left eye, nonvisually significant nuclear sclerotic cataract to both eyes, Type 2 diabetes with no diabetic neuropathy, and myopia/astigmatism/presbyopia.  (Tr. pp. 23-31).  Plaintiff was next seen at the ILPH on June 4, 2014 for complaints of intermittent, non-radiating chest pain for the previous two weeks that worsened with deep breathing and was accompanied by fatigue, shortness of breath, nausea and vomiting, numbness, and generalized weakness.  The episodes of nausea and vomiting had been acute for one day and were associated with loose stools.  Plaintiff had normal heart sounds with a normal rate and regular rhythm and breath sounds and effort were normal with no wheezes or tenderness.  Plaintiff was treated with medications and fluids and her chest pain resolved.  Given the largely stable workup, it was felt that Plaintiff's symptoms may have been an adverse reaction to Cellcept.  (Tr. pp. 32-82).

The following day, Plaintiff underwent magnetic resonance imaging at the ILPH. Those studies revealed no significant thoracic or rib abnormality.  An MRI of the cervical

spine demonstrated disc herniation with cord compression and deformity at C4-5 as well as degeneration at C6-7 and C5-6 and to a lesser extent at C3-4 and C2-3.  (Tr. pp. 83-111). Plaintiff was seen for further follow-up care on June 11, 2014 with her rash now having spread to her lower abdomen.  A dry cough was still present but improved and Plaintiff was noted to use an Albuterol nebulizer once or twice per day.  The assessment was sarcoid and pulmonary nodules.   Further testing was scheduled.   (Tr. pp. 112-124).   She was subsequently seen at the ILPH on June 16, 2014, presenting with a three-year history of low back pain at a level of "7," bilateral leg pain at a level "8," neck pain at a level of "4," and bilateral arm pain at a level of "6."  The leg pain was at the anterior of the thighs and radiated to all toes, the right greater than the left; the arm pain started at the shoulders and radiated to the fingers; and numbness and tingling were present in the hands resulting in her dropping things.  Upon physical examination, Plaintiff had normal gait and station, 5/5 strength throughout, normal muscle tone in all extremities, and normal cervical and lumbar range of motion.  The assessment on this date was neck pain and lumbago.  An MRI of the lumbar spine was to be ordered, Plaintiff was counseled on weight loss, and she was to be referred to physical therapy.  (Tr. pp. 125-134).

Plaintiff underwent an MRI of the brain on June 20, 2014 which revealed no intracranial abnormality to suggest either an acute or sarcoid-related process.  (Tr. pp. 135-146).  The final set of medical records that appear in the administrative proceedings below document an exercise stress cardiogram that was performed on June 25, 2014.  Plaintiff tolerated the procedure well and no adverse findings were noted.  (Tr. pp. 147-159).

Plaintiff challenges the Commissioner's decision to deny her Social Security benefits on three grounds.  In the third of those challenges, Plaintiff alleges that the ALJ did not apply

the correct legal standard when assessing her residual functional capacity ("RFC") to work and that the RFC assessment that was arrived at was not supported by substantial evidence. Under the rubric of that challenge, Plaintiff argues that "[t]he ALJ failed to incorporate into her RFC [assessment] the multiple absences Plaintiff would have incurred due to her medical treatments as well as due to the severe joint and chostochondritic (chest wall) pain caused by her disease." (Rec. doc. 8-2, p. 23).  In her reply to Defendant's cross-motion for summary judgment, Plaintiff further argues "… that for a period of one year, from 2013 through 2014, Plaintiff was so ill as to average work absences of more than three days per month.  The vocational expert testified that such [a] level of absenteeism would preclude competitive employment.  (Tr. 342)."  (Rec. doc. 13, p. 9)(footnote omitted).  Finding that challenge to have merit, it will be recommended, for the reasons that follow, that Plaintiff's case be remanded to the Commissioner for further proceedings.

The administrative record in this case is somewhat voluminous, totaling 1093 pages in length.  As a review of that record and this opinion readily illustrate, the treatment and testing that Plaintiff has required for her various conditions during the relevant time period at issue has been frequent and extensive.  In the roughly nine-month period between the alleged onset disability date of January 12, 2013 and the administrative hearing that was held on October 16, 2013, Plaintiff was evaluated and/or received medical treatment on no less than 30 occasions, including eight instances in May of 2013 alone.  Among those 30 occasions were two hospital admissions and five Remicade infusions which, according to the medical literature attached to Plaintiff's cross-motion, require two hours for administration and several hours of observation afterwards.  (Rec. doc. 8-4).  Absent from Plaintiff's pre-hearing medical records, however, were the results of any consultative evaluation(s) which,

26

in the Court's experience, Social Security claimants are typically requested to undergo and which customarily result in the issuance of conservative findings and opinions against which those from a claimant's treating sources are weighed.   At the administrative hearing, Plaintiff's counsel posed the following question to the VE:

> Q:    Let me ask you a different question.  If the individual as described by Judge Gattuso, due to the requirements of the medical treatment, would miss work more than one to three times per month, how would that affect her ability to perform (INAUDIBLE) past jobs or the other jobs?
>
> A:    I don't feel that if a[n] individual would miss three or more times a month, she would not be able to maintain employment.  Does that answer?
>
> Q:    It does.

(Tr. p. 342).

Following the issuance of the ALJ's decision on November 29, 2013, Plaintiff's counsel formally requested review of the decision by the AC and submitted a letter brief dated January 27, 2014 in support of that request.  (Tr. pp. 283-285, 519-527).  By cover letter dated May 22, 2014, counsel provided the AC with 123 pages of additional medical records covering the time period of November 11, 2013 to May 5, 2014.  (Tr. pp. 528, 160-282).  Subsequently, by cover letter dated July 9, 2014, Plaintiff's counsel provided the AC with an additional 150 pages of medical records covering the time period of May 29, 2014 to June 25, 2014.  (Tr. pp. 8-159).  These two sets of post-hearing medical records document an additional 28 occasions on which Plaintiff was evaluated and/or treated in a roughly eight and one-half month period, including seven times in June of 2014 and six times in January of 2014.  (*Id.*).

On December 15, 2014, the AC denied Plaintiff's request for review of the ALJ's decision, stating that it had "considered" counsel's letter brief of January 27, 2014, counsel's

May 22, 2014 cover letter that accompanied his first set of post-hearing medical records, and two pages of medical records documenting what was Plaintiff's fifth Remicade infusion on October 14, 2013.  (Tr. p. 1).  Those three submissions were duly identified on an "AC Exhibit List" and "Order of Appeals Council" that were appended to the AC's decision.  (Tr. pp. 5, 6). On the second page of its decision, the AC also indicated that it had "looked at" the two sets of post-hearing medical records that had been submitted by Plaintiff's counsel but found that those records related to a later time period and did not affect the decision of whether Plaintiff was disabled before the issuance of the ALJ's decision.  (Tr. p. 2).  Although the two sets of post-hearing medical records, which totaled 273 pages in length, were filed in the administrative record below, they were not identified on the AC Exhibit List or the Order of Appeals Council referenced above.

Evidence that is submitted of the first time to the AC is considered part of the record upon which the Commissioner's final decision is based.  *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005).  "If additional evidence is presented while the case is pending review by the Appeals Council, courts [] customarily review the record as a whole, including the new evidence, in order to determine whether the Commissioner's findings are still supported by substantial evidence."  *Higginbotham v. Barnhart*, 163 Fed.Appx. 279, 281 (5th Cir. 2006). Remand is appropriate when the new evidence dilutes the record to the point that the ALJ's ultimate finding is insufficiently supported.  *Id.* at 281-82.

The Fifth Circuit has held that if an individual's medical treatment interrupts her ability to perform a normal, eight hour workday, then the ALJ must determine whether the effect of treatment precludes the claimant from engaging in gainful activity.  *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000)(citing *Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1980)).

In *Epps v. Harris*, 624 F.2d 1267 (5th Cir. 1980), the claimant submitted post-hearing evidence that he underwent traction for his back injury on a nearly daily basis. *Epps*, 624 F.2d at 1272-73. There, the Fifth Circuit found that "[a]lthough the Appeals Council acknowledged that … [the claimant] had submitted new evidence, it did not adequately evaluate it." *Id.* at 1273. Accordingly, the case was remanded to the Commissioner for a full evaluation of the effect of the claimant's treatment regimen on his ability to perform his former job or to pursue any other substantial gainful employment. *Id.* While the plaintiff in *Newton* did not require daily treatment as did the claimant in *Epps*, the record indicated that she "… visited the doctor, the hospital, and the emergency room frequently during the period in question." *Newton*, 209 F.3d at 459. That case, too, was remanded to allow the ALJ to consider the effect of ongoing treatment on the claimant's ability to remain gainfully employed during the period of claimed disability. *Id.*

The post-hearing evidence that Plaintiff submitted to the AC is undoubtedly new in that it was not before the ALJ at the time of her decision. *Owen v. Colvin*, No. 12-CV-1179, 2013 WL 4782814 at *4 (W.D. La. Sept. 6, 2013). It also appears to address the period prior to the ALJ's decision, and is thus material, because it is premised on Plaintiff's long-standing impairments. *Id.* That being the case, and consistent with the teachings of *Newton* and *Epps*, it will be recommended that Plaintiff's case be remanded to the Commissioner for a reassessment of her RFC and for a proper evaluation of the effect of Plaintiff's treatment regimen on her ability to work.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that Plaintiff's case be remanded to the Commissioner for further proceedings consistent with this opinion.

29

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc). [2]

New Orleans, Louisiana, this __29th__ day of _____February_____, 2016.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[2] *Douglass* referenced the previously-applicable 10-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.